# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

      v.

THE L.E. MYERS COMPANY,

      Defendant.

No. 05 MC 480
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

Zagel, District Judge,

## I.　FACTS

The L.E. Myers Company, founded in 1891, is now one of the largest electrical contracting companies in the United States, employing over 3,000 union workers – over a thousand of whom work as linemen, maintaining and repairing electrical power systems for the nation's utilities.  Two of Defendant's employees were killed while performing maintenance on electrical transmission towers owned and operated by Commonwealth Edison Company ("ComEd").  Twenty-year-old Blake Lane, an apprentice lineman, died by electrocution on December 28, 1999, when he came into contact with an energized electric distribution line in Mt. Prospect.  Wade Cumpston, a journeyman lineman for Defendant, died by electrocution less than three months later, on March 25, 2000, while changing insulators on de-energized transmission wires.  In that same incident, another lineman was injured, but not fatally, by electrocution.

L.E. Myers was charged with two counts of the misdemeanor of wilfully violating OSHA regulations, causing the death of an employee.  For better or worse, such criminal charges are not common in industrial America – perhaps because of the burden of proving a wilful violation, as

opposed to negligence. A jury found the company guilty of the Blake Lane charge (Count One) and not guilty of the Wade Cumpston charge (Count Two). Misdemeanors such as these are triable before Magistrate Judges, and appeal lies within the District Court. Fed. R. Crim. P. 58(g)(2)(D).

### A. L.E. Myers and ComEd

Defendant contracts with utilities to maintain and repair transmission lines, which carry very high voltage electricity from generating plants to networks that distribute the power to consumers. Defendant had a comprehensive service contract with ComEd to do the maintenance work on ComEd's electrical transmission network. The estimated value of the contract was $750,000. Defendant received work assignments from ComEd on an ongoing basis under the contract.

Defendant does a lot of maintenance work – millions of work hours at different utility sites each year. The work is patently dangerous, scores of workers are killed by electrocution each year, and the OSHA regulations exist to address (and reduce) this danger.

Defendant was not new to ComEd. In securing its contract in early December of 1999, Defendant represented to ComEd that it was familiar with ComEd's electrical transmission network, and experienced in handling work projects for ComEd.

The ComEd contract obligated Defendant to provide qualified personnel to perform requested maintenance work. It also required Defendant to complete assignments in a workmanlike manner and in conformity with ComEd's construction standards. ComEd provided Defendant with its specifications of the construction standards. Under the express terms of the contract, Defendant also had the sole responsibility for compliance with Occupational Safety and

Health Administration ("OSHA") safety standards.[1]   Defendant had the responsibility to determine the manpower, equipment, and time needed to complete work assignments. Accordingly, ComEd policy was not to instruct Defendant or its employees on how to perform any maintenance work.  This is a common practice in industry because the company contracting work out fears that, despite its contract with a provider, it might assume some risk of liability by giving advice or direction.  ComEd followed its policy in this case.

ComEd would have an inspector visit the worksite to report the progress of maintenance work and certify the completion of requested assignments.  This was required by contract, presumably to avoid later disputes about the performance of the work when the time came to pay invoices for services and to assure ComEd that its specifications were being met during the progress of the work.  The inspector was not responsible for work site safety or for instructing Defendant's employees about how to perform a particular job – this was left up to Defendant.

Under the contract, Defendant was within its rights to ask ComEd for more information regarding work assignments if Defendant or its employees felt that more information was necessary.  There was no evidence of Defendant ever failing to receive requested information from ComEd.

## B.    Tower 97

Blake Lane died on Tower 97 at the Mt. Prospect facility.  He came into contact with what should have been a static wire – static because its function is not to transmit electricity and therefore it is not usually energized.

---

[1] Defendant also has responsibility for safety compliance under the collective bargaining agreement with the International Brotherhood of Electrical Workers – the union representing apprentice and journeyman linemen like Lane and Cumpston.

Transmission towers may support six energized power lines, with three running on each side of the tower. Each power line is energized with hundreds of thousands of volts of electrical power. Above the three power lines on each side is a "static wire." "Static wires" act as lightning rods to protect the transmission power lines which run below it. Metal hardware bonds the static wire to the steel tower. When lightning strikes, it is drawn to the static wire and flows to the ground through the steel tower, bypassing and protecting the transmission lines. In contrast, the power lines themselves are connected to the tower by "insulators" so that the electrical current is not interrupted at the point of connection. By industry definition, a "static wire" is designed to be a "dead wire" – a grounded lightning rod designed to *protect* the power lines which run below it.[2] The union-industry training program instructed that static wires are grounded lightning rods, which did not require testing or inspection before working on them. The evidence was that static wires are routinely worked on without testing or other precaution.

When the L.E. Myers crew worked on ComEd Tower 97, one of the "static wires" was no longer static. In 1968, ComEd had altered the design and function of the west-side "static wire" by converting it into an electric power line. A near collision between an aircraft and a ComEd transmission tower, or its lines, led the Federal Aviation Administration to require ComEd to install red flashing warning lights on top of certain transmission towers which were in the flight pattern for O'Hare Airport. To provide a source of power for those warning lights, ComEd converted some portion of the <u>west</u>-side static wire over the transmission lines in Mt. Prospect to an actual power line – by adding small insulators to that conductor, energizing it to the tune of

_____

[2] Other terms for static wires include "overhead ground wires," "shield wires" and "shield lines." (Trial Tr. 222).

2400 volts, and connecting that new power source to the aircraft warning lights.  Tower 97 was one of those towers, although 97 itself did not have any aircraft warning lights on top of it and was not in the flight path of the airplanes.  The east-side static wire was not changed.

ComEd did not post warnings that it had altered the grounded static wire into an actual energized power line, nor did it put cautionary signs on the tower itself, although it routinely did so for similar hazards.  It included no warnings in the written materials it provided to its contractors and no oral alert was given to linemen.[3]

### C.    The Blake Lane Fatality

Blake Lane started working for Defendant in December of 1999.  Lane had recently attended the well-known (and hard to get into) International Brotherhood of Electrical Workers training school in September of 1999 to become an apprentice lineman.  "Apprentice lineman" is an IBEW classification for beginning linemen whose work is restricted in various ways until apprentices have logged a sufficient number of work hours under the supervision of more experienced "journeyman linemen."  The specific training Lane had was a three-week training program of basic instruction in climbing, tying knots, working with materials of the electrical trade, and understanding elementary electrical theory concepts, e.g.,  if an electrical line is not grounded, then that line is not dead.  Lane was just beginning a seven-step, three-and-one-half-year apprenticeship program to become a journeyman lineman.

---

[3]Defendant proferred evidence that a ComEd lineman had been killed by what appeared to be a static line that was energized.  After the OSHA investigation, ComEd agreed to provide warnings about this hazard to its own employees and to have its foremen accompany outside contractors to the worksite to warn them about those hazards.  The trial court excluded that evidence as irrelevant, presumably because proof that ComEd may also have been guilty does not absolve L.E. Myers if it had an independent duty to discover and warn its employees of these same dangers.

As an apprentice, Lane went to work in Indiana stringing fiber optic phone cable on structures 18 to 20 feet off the ground. He did not deal with "transmission" lines (69,000+ volts) or "distribution" lines (12,000- volts). Both kinds of lines – conductors – are connected to towers by "insulators" that prevent electric current from being diverted from the power lines through the tower and into the ground. Apprentice linemen are prohibited from working on or near energized transmission and distribution lines.

On December 27, 1999, Lane worked on a job in Streator grounding wooden poles by running a wire from the top of the pole to the ground. The transmission lines on these poles were de-energized while he worked. He worked with an apprentice, Robert Huchel, who had been his roommate and friend at training school.

That day, ComEd called Defendant about an emergency job repairing the east-side static wire on Tower 97, because inspection had disclosed it was coming loose. Photographs showed a pin had partially backed out of the hardware connecting that wire to the tower. Should the pin disengage entirely, the static wire would fall into the power line, likely causing a service outage.

That same day, Lane and Huchel's supervising foreman, Darrin West, told the men they would be traveling with him to the ComEd job the next day. It would be their second assignment for Defendant. West, a journeyman lineman since February of 1999, was a relatively new foreman for Defendant himself, on the job for a total of three or four months. Foremen supervise the assigned work crew and have a duty to advise that crew of safety hazards and ensure compliance with OSHA safety standards and all safety procedures for the duration of the assigned work. The foreman makes the final decision of whether a crew may safely perform a

particular job and has the authority to instantly halt unsafe practices and violations of OSHA standards. For all practical purposes, Defendant's foremen are its managers on the job.

Tower 97 was a steel construction high-voltage transmission tower with two 345,000 volt circuits, one on each side (west and east) of the tower. Each circuit consisted of three transmission lines. The uppermost portion of a steel transmission tower is often called a "goat head." The static wires were grounded to the tower arms on each side of the goat head and connected directly to it by a "suspension shoe." A metal pin held in place by a "cotter key" connects the suspension shoe to the goat head.

The west side of tower 97's goat head actually held a live electric distribution line where the static line would ordinarily be. ComEd turned what had previously been a static wire into an electric distribution line by suspending the line from the tower arm on insulators and energizing it. The tower obstruction warning light nearest to tower 97 was located on tower 99. (Trial Tr. 772).

Defendant assigned a general foreman (who is one step above a foreman like West), Roger Nelson, to the job. West and his two apprentices arrived early in the morning and met Nelson, who led them to Tower 97. At the site, West held a pre-job briefing, telling Lane and Huchel that the transmission lines were hot and telling Lane to walk softly on the tower to avoid causing the pin on the east-side suspension shoe to fall out. He told Huchel to be careful with the hand line (a rope and pulley device) they would use to hoist and lower equipment up and down the tower. The rope had to be taut so it would not blow into the hot lines. The briefing did not mention the west-side of the tower.

Foreman West, followed by Lane, climbed the tower.  At the top of the tower, West hung the hand line in the middle of the tower.  Huchel sent up a chain hoist (a tool used for holding up a string of wire) along with some extra cotter keys.  Then West climbed out to the east side of the goat head and found the pin was partly out from the suspension shoe.  West placed a safety apparatus on the east side static wire to keep it from falling.  Then Lane climbed out to the east side of the tower where he and West and Lane replaced the pin, which is a routine and brief task.  Then they climbed back to the center of the goat head where West began lowering the hoist down the hand line.

General foreman Nelson yelled up at West to have him check the west side of the goat head.  Nelson had examined the east side of tower 97 with binoculars from the ground but made no other visual inspection of the west side of the tower.  Nelson later testified that he was able to see the insulator from the ground without the aid of binoculars, but this observation was made only after Lane had already been electrocuted.

West sent Lane to examine the west side suspension shoe by himself.  West looked at what he believed was the west side static wire, but from his vantage point at the center of the goat head he could not see the hardware, including the insulator.  Based on what he could see, he assumed the line was not energized – though he knew that OSHA regulations require all electric lines and equipment to be treated as energized until proven otherwise.

Before sending him to inspect the west side suspension shoe, West told Lane not to touch the wire because West was concerned that doing so could cause the pin to fall out of the suspension shoe.  But Lane did touch the wire and this killed him.  Huchel, on the ground, heard a pop and saw Lane roll off the tower and hung there by his safety belt. West, lowering

equipment to the ground, did not apprehend Lane's electrocution until Nelson yelled up at him. Huchel climbed the tower to aid Lane, but when he reached the top of the tower he saw that Lane was dead. Huchel and West removed Lane's body from the tower arm.

There is no dispute about any of this and little dispute about the rest of the fact – only about the inferences that should be drawn from them. However, the few facts in dispute were quite significant. The principal issues at trial revolved around the soundness of Defendant's foremen's practices and what Defendant's foremen knew or should have known. The evidence on these points was the following:

(A) Norman Streseman, a ComEd inspector and former lineman himself, was present at the worksite on the day Lane was killed. Streseman's sole job was to make sure contractors like Defendant completed the assigned work. He did not supervise the work or the workers.

Streseman had arrived at the worksite at 8:00 a.m and noticed an insulator holding the west side static wire to the tower while he was waiting for Defendant's crew to arrive. He became concerned that the west side static wire was not grounded to the tower and could be energized by "induction" electricity. Induction occurs where electricity being transmitted at high voltages flows through the air to energize nearby ungrounded lines, even if those lines are de-energized. Streseman feared that the energized 345,000 volt transmission lines on tower 97 could energize the ungrounded west side wire through induction. Streseman testified that he told general foreman Nelson about the insulator, and that he told Nelson, and that no one should touch the west side wire. He asked Nelson if he had any grounding cables to help protect the workers. Nelson denied ever hearing this from Streseman and no other member of Defendant's crew heard it. None of them ever saw the insulator, which was a little larger than six inches and

was 115 feet above the ground.  There was evidence that it was Streseman who asked Nelson to have his crew check the west side of the tower, but this testimony was disputed.

(B) Defendant's crew stopped to pick up materials for the job.  West never bothered to open the box of materials or check the materials against the work order.

The work order provided by ComEd indicated that Defendant's crew would be performing maintenance work on both sides of tower 97.  Foreman West received a copy of this work order in advance of the job.  However, he never read the work order prior to Lane's death, and so never saw the ComEd construction specifications (required by Defendant's contract with ComEd) described in that work order.

West's pre-job "tailgate meeting" with apprentice linemen Lane and Huchel lasted about five minutes.  West knew that Lane and Huchel were both starting apprentices and that they required a more extensive safety discussion.  West was aware that neither one had climbed a steel tower before or worked near energized transmission lines approaching 345,000 volts.  Defendant did not give these apprentice linemen any training regarding working near energized transmission lines, nor did anyone ask them if they had any such training.

The apprentices were not barred, by law or regulation, from the work they performed. The IBEW had assigned the apprentices to Defendant, and OSHA regulations do not prohibit such apprentices from working on transmission towers.  The union-industry training program encouraged early climbing of towers to find out if the apprentice has the ability to climb such high towers.

(C) An employee of ComEd's parent company and an IBEW union official both testified that the installation of electric distribution lines in the static position is a common practice within the ComEd transmission network – particularly in and around the area of an airport.  In addition,

the government introduced evidence, the admissibility and meaning of which is contested here, that Defendant had, in 1970, performed maintenance work on the same electric distribution line at a different tower (and in the "static position") that killed Blake Lane.

Before the accident, the L.E. Myers crew members had never heard of a static wire being converted into an "energized" power line. The work order which ComEd provided to the L.E. Myers crew gave no warning about such a hazard to alert West. The crew members did not become aware that the west-side "static wire" was actually an energized power line until after the accident occurred. There is no evidence that *any* L.E. Myers crew in the history of the company had ever before worked on or near an "energized static wire" except once nearly thirty years earlier. "Energized static wires" are not shown to exist anywhere in the industry outside of ComEd's territory in northern Illinois (and only near airports) and no expert testified that what ComEd had done constituted a recognized hazard in the industry.

### D. The Wade Cumpston Fatality

The jury acquitted Defendant of wrongdoing in connection with the death of lineman Wade Cumpston in Plainfield about three months after Lane was killed. The jury heard that evidence and was free to consider what was proved on that count for whatever value it had in determining the "wilfulness" of Defendant in respect to Blake Lane's death.

Cumpston was electrocuted by inductance electricity when he became entangled with a grounding cable while working with a crew to replace the insulators connecting transmission wires to steel towers. The 345,000 volt transmission lines on one side of the tower were de-energized while the maintenance work was being performed. The lines on the other side were still hot. This meant that induction electricity could flow through the air from the energized lines to the de-energized lines. For this reason, OSHA requires employers to place and arrange

11

temporary grounds connecting de-energized lines to each other and, in this case, to the uninsulated bucket from which Cumpston and Feiden worked. These protective grounds ensure that induced voltage will be passed harmlessly through the tower into the ground.

Michael Young, Cumpston's co-worker, testified that the grounding cables at the Plainfield worksite were too short and relegated the linemen to a small working space while they replaced the insulators. The short grounding cables could not be used to ground the bucket on the lift truck. The grounding cables had C-clamps on both ends, which were appropriate to connect a grounding cable to a transmission line. However, one end of each grounding cable had to be connected to the steel tower and, since there were C-clamps instead of flat clamps, the linemen had difficulty keeping the ground wires on the tower. Young and Cumpston spoke with their foreman, Clifton "Shorty" Gooch, about replacing the inadequate cables. According to Young, Gooch at first said he would contact general foreman Nelson to obtain adequate grounding cables. When the men complained a second time, foreman Gooch told them to work with the cables that were available or go home. The men continued to work and Cumpston was ultimately electrocuted.

The jury found Defendant guilty of willfully violating five separate OSHA regulations (Count One) and found each of the five violations caused the death of Blake Lane.[4] The jury found Defendant not guilty of willfully violating OSHA regulations and causing the death of Wade Cumpston (Count Two).

_____

[4] Appellant was found guilty of willfully violating OSHA regulations located at 29 C.F.R. §§ 1910.269(a)(2)(i) or (a)(2)(ii), 1910.269(a)(3), 1910.269(c), 1910.269(l)(1), and 1910.269(l)(2). (Trial Tr. 2198.)

In imposing sentence, Magistrate Judge Brown noted that "L.E. Myers does not dispute that in the period of 1972 to the date of the offense here, which is December of 1999, L.E. Myers have been issued 55 OSHA citations and suffered 35 workplace fatalities." Magistrate Judge Brown further stated: "Accordingly, and in light of the fact that the jury found L.E. Myers willfully violated five separate regulations, the Court will impose the maximum fine, $500,000."

### E.    The 1995 OSHA Regulations

One regulation generally requires the employer to determine conditions at the worksite related to safety hazards:

> Existing conditions related to the safety of the work to be
> performed shall be determined before work on or near electric lines
> or equipment is started. Such conditions include, but are not
> limited to, the nominal voltages of lines and equipment . . . .

29 C.F.R. § 1910.269(a)(3). [5]

---

[5]A previously enacted regulation governing construction activities *does* explicitly require testing or inspection: "Existing conditions shall be determined before starting work, *by an inspection or a test* . . . ." 29 C.F.R. § 1926.950(b)(1) (emphasis added). When OSHA enacted the existing conditions regulation, which governs the maintenance activities at issue here, it intentionally omitted the inspection/test requirement: "Existing conditions related to the safety of the work to be performed *shall be determined* before work on or near electric lines or equipment is started." 29 C.F.R. § 1910.269(a)(3) (emphasis added). When omitting the inspection/test language in the later-enacted maintenance standard, OSHA explicitly stated that the existing conditions requirement of the maintenance standard "was taken from 1926.950(b)(1)," but that the inspection/test language was omitted because "[i]t is not OSHA's intent routinely to require employers to take measurements in order to make the determinations required by 1910.269(a)(3)." Preamble to 29 C.F.R. § 1910.269(a)(3), 59 Fed. Reg. 4344. What appears in the record does not give guidance on what is meant by inspection or test. It may be that inspection requires a series of mandated steps accompanied by a formal test. If so, elimination of the routine requirement of such work might be justified on cost-benefit grounds. It is quite another thing to rest, as Defendant does rather lightly, on the proposition that OSHA meant to excuse any obligation to look for obvious dangers and to, for em, check for energy on a questionable line. The cost-benefit justification would be very difficult to make, bearing in mind that "[d]angerousness is a function of the magnitude of the harm that will occur if the danger materializes and of the probability that it will materialize." *United States v. Boyd*, 475 F.3d 875, 877-78 (7th Cir. 2007). In this case the harm is catastrophic, its occurrence cannot be said to be

A "pre-job briefing" regulation requires that a job briefing be held before the work to discuss such hazards:

> The employer shall ensure that the employee in charge conducts a job briefing with the employees involved before they start each job. The briefing shall cover at least the following subjects:  hazards associated with the job . . . .

*Id*. at 1910.269(c).

A "training" regulation generally requires the employer to train its employees with respect to safety practices and procedures:

> Employees shall be trained in and familiar with the safety-related work practices, safety procedures, and other safety requirements in this section that pertain to their respective job assignments. Employees shall also be trained in and familiar with any other safety practices . . . that are not specifically addressed by this section but that are related to their work and are necessary for their safety.

*Id*. at 1910.269(a)(2).

A "minimum approach distance" regulation requires that unprotected employees maintain a minimum distance from energized lines:

> The employer shall ensure that no employee approaches or takes any conductive object closer to exposed energized parts than set forth [as specified by level of voltage].

*Id*. at 1910.269(1)(2).

A related regulation deals with employee qualification:

> Only qualified employees may work on or with exposed energized lines or parts of equipment . . . [or] may work in areas containing unguarded, uninsulated energized lines or parts of equipment operating at 50 volts or more.  Electric lines and equipment shall

_____

rare and the cost of looking at a tower with binoculars seems relatively small.

be considered and treated as energized unless the provisions of
paragraph (d) or paragraph (m) of this section have been followed.

*Id*. at 1910.269(1)(1).

## II.    THE CORPORATE KNOWLEDGE INSTRUCTION

Defendant first challenges the instruction which allowed the jury to infer corporate

knowledge that the particular sort of apparently static wires in this case were, on occasion,

energized on ComEd transmission towers.  Corporate knowledge is important.  *See United States*

*v. Ladish Malting Co.*, 135 F.3d 484, 490 (7th Cir. 1998).

In 1970, a Myers crew worked on the very same west-side "static wire" that electrocuted

Lane, though at an adjacent ComEd transmission tower.  The crew completed this work without

incident.  A jury hearing this evidence could conclude that Myer's electricians would know in

1970 that the wire had been live, and proceeded accordingly.  The issue is whether this

information could properly be considered the knowledge of Myers, rather than that of a few of its

employees some decades earlier.

A jury is not allowed to find that a corporation knows something solely because an

employee of the corporation knows it unless that employee has some duty to report it up his or

her chain of command.[6]  "If 'authorized agents' with reporting duties acquire actual knowledge,

it is entirely sensible to say that the corporation has acquired knowledge."  *Id*. at 493.

---

[6]The issue is not necessarily that Defendant knew that static wires were sometimes
energized at ComEd. The case would be different (and the charge far more serious) if Defendant
was proved explicitly to have known this.  The issue is whether Defendant knew that it was
violating OSHA standards.  A company that fails to follow procedures to discover hazards may
never know of the hazard until one of its employees is injured or killed by some latent danger
which the procedures would have made patent.

If, in 1970, a wire situated where static wires ordinarily are located was apparently affixed to the tower so that it could be energized, then Defendant's employee would have discovered this in the course of doing work on the wire.  Both parties agree that the discovery would be within the scope of his or her employment.  The parties disagree over whether something more is required, i.e. the duty of the employee to report it to the employer.  This means that the contest is over the use of the phrase "within the scope of employment."

The Government cites cases favoring the use of the unadorned "scope" phrase, without the *Ladish Malting Co.* gloss about duty to report.  Defendant reads the gloss as an invariable requirement in corporate knowledge instruction cases.  I think the cases are best understood to mean that the duty-to-report phrase is appropriate in cases where, as here, a corporation has thousands of workers doing thousands of individual repairs under a system of on-site supervision.  A smaller corporation, with a less elaborate chain of command, might well be held to know what each of its employees knows.  Indeed, under those circumstances, it could be fair to presume that all employees have a duty to report what they learn.  To put it another way, with companies like Defendant, the relevant scope of employment rightly includes a duty to report what is learned to the front office.  This is not what the jury was told.  The instruction was:

> In deciding whether the defendant corporation acted knowingly, you must consider that a corporation can act only through its employees and agents.  Accordingly, knowledge obtained by the corporation's employees acting within the scope of their employment that concerns a matter within the scope of their employment is knowledge possessed by the corporation.  Once a corporation acquires that knowledge, it remains with the corporation even if the employee is no longer employed by the corporation, if the knowledge is of continuing importance to the business of the corporation.

The Government seems to concede it is theoretically possible that cases may exist in which the judge is required to instruct the jury that corporate knowledge is knowledge acquired by an employee with the duty to report it to headquarters. It argues that this is not such a case because there is no dispute that in 1970 (and today) Defendant's foremen are expected to supervise the work crews and to ensure that safety procedures are followed. Foremen are to investigate hazards and they decide whether it is safe to proceed. They are the "eyes and ears on the job." Because hazard avoidance is within the precise scope of the foreman's duties, the foreman's knowledge is Defendant's knowledge as well.

There is no evidence of a specific duty of foremen to report hazards in L.E. Myers' regulations and formal procedures. Defendant argues that this absence means that it did not have corporate knowledge, but the Government position is that a foreman, whose job is to understand and direct the task, inherently has knowledge as part of his duties. If the foreman has knowledge, then the company has knowledge – as opposed to the case of an apprentice who happened to notice some danger and simply avoided it without mentioning anything to his foreman or co-workers. This argument cannot be valid in light of *Ladish Malting*, which clearly required a duty to report the hazards to higher-ups.

The Government argues, alternatively, that the instruction would not have made a difference. The records of the 1970 work show that a supervisor above the level of foreman was present in 1970 and such "general foremen" would indisputably have a duty to report that an electric distribution line was located where one would expect the line to be static. This could be true, but it has not been proven.

Lastly, the Government argues that the evidence was clearly harmless. The heart of the case was the simple fact that the foremen on the job when Blake Lane was ordered to climb the

tower did not visually inspect the connection between the line and the tower. They assumed it was static. Had they used their binoculars, they could have seen the insulator connecting the wire to the tower. In any event, they did not treat the wire as live until shown otherwise, as OSHA requires them to do.

The defense replies that, judged in the context of the trial, the error in the instruction was crucial. The Government argued that defendant <u>knew</u> as of 1970 that there might be live wires appearing where static wires were supposed to be. The case was presented to the jury, in part, as an actual corporate knowledge offense, not simply a knowing violation of this or that OSHA procedure. The conviction could easily have been based upon specific corporate knowledge of facts that established a violation of each of those regulations.

Harmless error analysis may require a look at how the case was argued to the jury. In my view, this is not a case in which there are patently harmful errors in the receipt of evidence and there is little point to looking at how the evidence was used by the prosecutors. Conviction could well have been had based on the failure to make sure that the line was safe – a willful failure to follow well-known OSHA regulations whose mandate is justified by ordinary common sense. In simple terms, the case could have been won without the 1970 evidence, which is not inherently powerful. The prior work incident was nearly three decades old when the current incident occurred. A jury could easily discount its significance.

In the prosecution's opening, it cited the work done in 1970, argued that Defendant knew, recited the words of the erroneous instruction and emphasized the presence of the foremen in 1970. Then, the Government argued "even putting that aside [the energized static line] wasn't hidden from anybody . . . all they had to do was look up, they just didn't do it." The 1970

incident was not the first point of attack on Defendant's conduct.  The first point of attack was

deliberate indifference at the site on the day of Blake Lane's death.[7]

The defense response was, primarily, that there is no regulation with specific instructions

on what safety steps are to be taken, even when these steps are not complicated and easy to

describe.  Thus, Defendant was not indifferent to any requirement of any regulation.  This

argument emphasizes the fact that visual inspection is not required by regulation.  Defendant also

---

[7]Before referring to the 1970 incident, the prosecutor stated the following:

Deliberate indifference.  Now there is no question that Mr. West and Mr. Nelson knew what the regulations were.  Knew that they had to conduct a pre-job briefing, knew that they had to determine preexisting conditions, knew that there were these minimum approach distances.  This is the meat and potatoes of their work.  Very basic stuff.

These are not some arcane regulations that a lineman would not know about.  This is, again, what they do day in and day out.  They have the tailboard meetings . . . pre-job briefings . . . before you do that you got to figure out what your hazards are.

And they did have actual knowledge that they didn't not follow those regulations.  They weren't sleep walking.  Darin West didn't think that Roger Nelson did it.  They weren't mistaken about that.  They knew.  And, in fact, admitted on the stand that they did not determine existing conditions.  For example, they knew that because they didn't determine those existing conditions, they couldn't have an appropriate pre-job briefing about the job that was being done on the west side.

So that gets us to the deliberate indifference.  Darin West and Roger Nelson were cavalier about their responsibilities that day.  They believed you've seen one, you've seen them all.  They made assumptions . . . those assumptions were deadly wrong.  Assumptions are not good enough.  They were indifference to what they were supposed to do.  They knew they were supposed to take a look at it and they just didn't do it.  I can't think of a more plain example of just total indifference to it.

I think I read this to you earlier.  To the extent assumptions in this industry are going to be made, you make them in a safe way.  You assume that everything is energized.  You don't assume that things are not energized, line or equipment.

states that, even if there is an implicit requirement of visual inspection, there is no evidence that any foreman on the site so understood the regulation.

With respect to the 1970 work, Defendant argued that this incident was discovered only when ComEd went through its files and found the 1970 job. Defendant, counsel noted, had 2000-3000 employees each year and should not be held responsible because "somebody 30 years ago worked from ComEd and we didn't remember it." The line in 1970 was not energized and no one was hurt.

> [ComEd] gave us drawings in 1970 and, lo and behold, there's an insulator on the drawing...In 1999 they gave us nothing . . . . One job [in 1970] out of – what? – 20,000, 30,000, 40,000 . . . . One in 1970 on de-energized lines from ComEd and we have knowledge in '99 . . . an uneventful maintenance job . . . in 1970, of continuing importance to L.E.

> Myers in'99? Now, if there had been an accident in 1970, I would agree with the government because we were on notice, but it was an uneventful job . . . wouldn't stand out in anybody's mind.

In its rebuttal, the prosecution devoted very little time to 1970, but it was an argument with some force. The prosecutor noted that when Defendant bid on the repair contract, it noted its experience, and then he rephrased the defense argument and answered it in this brief passage:

> [W]e come in to court, ladies and gentlemen, and we give them a work order showing that they actually did work on this energized line in 1970 and they still have the tenacity, the temerity to get up in front of you and to say, "How are we to know? I mean, this wasn't important to us in 1970. Why would it be important? No one got killed." Well, you know, that's what it tells you. Until they get hauled into court here, it's not important to them. It's not important to them.

Cases change their shapes during trial. Issues fall away, emphasis changes and what seemed crucial becomes insignificant. A trial judge sees it as it happens. An appellate judge has to read the whole record to see it, and, if the record is cold enough, the judge might not ever see

it. Appellate judges know this and have crafted deferential rules and standards of review to diminish the risk of error from fundamentally misreading the trial proceedings.

This is one of those cases that changed as it developed. The prosecution thought it would be good to show that in 1970 Defendant did know that wires in the static position might be energized. Defense counsel demonstrated to them that their evidence was weak. First, the 1970 evidence did not prove that Defendant knew anything, it only showed that it could have known. Additionally, there was no occasion for Defendant to consider the possibility that a certain line was energized in 1970, because it completed the job without incident. Defense counsel's closing argument correctly ridiculed the proposition that Defendant could be liable because it had corporate knowledge based upon an unremarkable incident thirty years earlier. In rebuttal, the prosecution was forced to turn that argument around to support its contention that the defense's argument showed that Defendant was careless about checking whether lines were or were not charged. In the end, the prosecution did not argue that Defendant had corporate knowledge that the line was charged, or even that it might be charged. The prosecution urged the jury to find guilt because Defendant did not check for charged lines and its attitude toward the 1970 incident demonstrated that it was heedless until a disaster occurred. The case left the jury to decide whether Defendant's foremen understood, in fact, that their self-acknowledged duty to check wires and equipment included all the wires on the tower, not just those in the non-static position. It is difficult to see how any reasonable juror would have regarded the fact that another foreman thirty years earlier might have known about a live wire in the static position as proof that these foremen or their superiors knew that they should have checked the static line.

The prosecution appeared not even to make this argument. The overwhelming emphasis of its argument was that the foremen should have checked, knew they should have checked, but

still didn't check.  They simply assumed the line was safe and, as a result, men died.  The 1970

incident was not a factor in this case and the instruction was harmless error.

## III.    THE "OSTRICH" INSTRUCTION

The trial judge gave the "ostrich" instruction.

> You may infer knowledge from a combination of suspicion and
> indifference to the truth.  If you find that a person had a strong
> suspicion that things were not what they seemed or that someone
> had withheld some important facts, yet shut his eyes for fear of
> what he would learn , you may conclude that he acted knowingly as
> I have used that word.  You may not conclude that the defendant
> had knowledge if he was merely negligent in not discovering the
> truth.

The instruction can only be given when there is evidence to support it.  The judgment of

the trial court in deciding to give it is reviewed under an abuse of discretion standard.  *United*

*States v. Fallon*, 348 F.3d 248, 253 (7th Cir. 2003).

The ostrich instruction is "iffy" in cases like these because in moral and practical (if not

legal) terms, the crime alleged is a form of criminal negligence.  Nobody wanted Blake Lane to

get electrocuted, but the failure to take certain affirmative steps is what killed him.  The worst

case for Defendant is that it ignored its prior knowledge from its own records about the danger

and ignored various OSHA regulations which, if followed, would have disclosed the danger to

the lineman.  The two poles of the instruction are: (1) Defendant has a strong suspicion that

things are not what they seem, or that information has been withheld, and yet shuts his eyes for

fear of what he would learn; or (2) Defendant is merely negligent.  It would be difficult to

characterize failure to check records or follow safety procedures as mere negligence, but it would

be even harder to characterize the acts here as indicative of a strong suspicion, followed by a

deliberate shutting of eyes.  *See United States v. Giovannetti*, 919 F. 2d 1223 (7th Cir. 1990)

(man who rents house used for gambling enterprise is not an "ostrich" for failing to be curious if he did nothing to prevent the truth from coming to light). The evidence is that the foreman did not read his paperwork or follow procedures. There is little to suggest that this act arose out of concern with what might result from those actions, rather than the carelessness with which many address what appear to be routine work.

If the Government could prove improper motivation, it would not have any difficulty showing that the omissions of the foreman would constitute avoidance of the truth. The Government's argument in support of improper motivation is lengthy, but it simply reiterates the list of the foreman's failings without mentioning a single fact to show that his motivation was concern for what he might learn. There was no evidence that the reason for the omissions was the "fear of what he would learn."

The Government defends its judgment in another way. It had better evidence that the foreman involved in Wade Cumpston's death acted to avoid learning the truth because he did not want to know about facts which would lead to the undesirable result that the job could not be completed that day or time. Workers told the foreman that the grounding cables were inadequate, but a jury could find that he still gave his crew an ultimatum that was the equivalent of a command that the work go forward. Although Defendant was acquitted of the charge concerning Cumpston's death, the cases were tried together. The Government argues it was entitled to the ostrich instruction in the Cumpston case. If that is so, then one of the standard remedies for Defendant would have been to ask for an instruction limiting the ostrich rule to Cumpston's case. Defendant neither asked for a limiting instruction nor objected to the lack of one. Therefore it can only prevail if the instruction was plain error, with respect to the Blake

Lane case, or ordinary error, if it should not have been given over objection in the Wade Cumpston case.

The instruction should not have been given in the Cumpston case. There was no more evidence that Cumpston's foreman avoided finding anything out for fear of what he might learn. He did not follow proper procedures; he simply assumed that the wire was not energized and was impatient with the complaints of apprentice lineman. His impatience was understandable because he just assumed the static wire was, in fact, static. Also, a jury would have to find that the foreman ignored a *lethal* risk because he feared what he might find, and was willing to let one of his crew die as a result of his deliberate shutting of his eyes – arguably an act of criminal homicide. The prosecution's argument, that the foreman knew that the correct equipment was missing but caused work to proceed by way of indirect threat, is actually a claim of criminal conduct based on what the foreman knew, not what he refused to discover.

Even viewing the evidence in the light most favorable to the Government, there was no basis on which a jury could properly consider whether the defendant's foremen buried their heads in the sand.

Lastly, the Government urges that the error was harmless. This argument has weight. The prosecution's argument never depended upon the idea that the foremen deliberately shut their eyes to lethal danger. The prosecution did not want to convert this case into a reckless homicide prosecution. In its argument, it specifically said that if the foremen could be said to have deliberately ignored a lethal risk, the offense would be far more serious than the one charged. It did not need, or want, to argue that the foremen were deliberately indifferent to the potential death of another electrician; that would have been a tough case to make for a penalty that would be grossly inadequate. It wanted to show they were deliberately indifferent to the

OSHA requirements, of which they were aware.  The argument was not that they were blinding themselves to lethal danger.  It was that they were assuming that the danger did not exist.

I find little emphasis on the knowledge instruction in the closing arguments, except to use it to echo the theme that the foremen did not care enough to follow the OSHA requirements.  The prosecution made a case of deliberate indifference to safety rules by virtue of the persistent assumption that a line was not energized.  I do not think it tried to make a case that the assumption was made out of fear of what might be learned.  In my judgment, the erroneous instruction could not have been a factor in the decision of the jury.

## IV.    THE EXCLUSION OF THE OSHA COMPLIANCE OFFICER'S NOTES

In 1979, a ComEd lineman came into contact with an energized line located where static lines were customarily located.  He died by electrocution.  OSHA investigated and, at a closing conference, its investigator made the following notes:

> Recommended the use of warning signs on the towers with energized static lines, not for the employees' protection because the current procedures adequately covers them, but primarily for contractors that may be hired . . . . As for contractors, a ComEd foreman would be detailed to accompany the contractors on any job.  My only reply was they be sure to follow their procedures and that their foremen be aware of the procedures established.  Stated if the penalties had been paid the case may be closed when I return and report.

L.E.  Myers denied that it had acted knowingly and denied that the OSHA regulations required it to discover whether a wire in the static position was energized.  The prosecution countered that such energized "static" wires were common and well-known.  The Government offered the testimony of a ComEd engineer and a local union employee to support its position.  Defendant countered by offering the investigator's notes which, had they been admitted, would

have led to the argument that energized "static" wires were sufficiently unusual that ComEd agreed to warn outside contractors about the hazards.

The trial court rightfully excluded the notes. The notes did not say that such wires are unusual, they simply asserted that a ComEd employee offered to follow a procedure to ensure that future contractors knew about them. From these notes, one cannot infer whether energized "static" wires were common and well-known, or rare and obscure in 1979. It only shows that ComEd was willing to take extra precautions in the wake of the death of one of its employees. This might be a situation in which ComEd is agreeing to add a belt to an existing (and well-known) pair of suspenders, or it could instead be agreeing to use a belt where there had been nothing else to hold the garment in place.

The evidence is inherently ambiguous and neither side could draw an appropriate inference from it. Mr. Olney, another ComEd employee, or the OSHA inspector all might have clarified the context and meaning of these notes, but Defendant only offered the notes and, possibly, other documents. In any event, I review the trial court's evidentiary rulings with deference. *Young v. James Green Mgmt., Inc.*, 327 F.3d 616, 621 (7th Cir. 2003). In this case that required deference is not necessary, since the ruling seems clearly correct.[8]

## V.  EXCLUSION OF AN OSHA DOCUMENT ACKNOWLEDGING THE UNRECOGNIZED HAZARD OF ENERGIZED WIRES

A month after the guilty verdict, OSHA published a commentary in the Federal Register stating that utilities should be required to warn outside contractors about the presence of energized wires in the static location on towers. It referred to such wires as a problem because it

---

[8]Defendant could have argued for this document's relevancy by asserting that it was aware of the notes and justifiably relied on them when conducting work at the ComEd towers in this case. However, Defendant made no such assertion.

is not something a contractor "should be expected to recognize." OSHA had come to this

opinion some months before trial and sent a proposed rulemaking to the Office of Management

and Budget, seeking approval to publish. The proposed rule (as applied to this case) would

require ComEd to:

> inform contract employers of: (1) Known hazards that are covered
> by this section, that are related to the contract employer's work,
> and that might not be recognized by the contract employer or its
> employees: and (2) Information about the employer's installation
> that the contract employer needs to make the assessments required
> by this section.

Proposed Rule, 70 Fed.Reg. 34,822, 34,936

The commentary in the Preamble appeared to refer to the Blake Lane death as an example

of the problem addressed by the rule:

> Sometimes the host employer is aware of hazards that are present
> at its facilities of which the contractor might not be aware. For
> example, what appeared to be a static line on one electric utility's
> transmission system was energized at 4,000 volts. Static lines are
> typically grounded. An employee of a contractor, perhaps not
> understanding that the line was energized, contacted the static line
> and was electrocuted.

*Id*.

In its commentary, OSHA also noted that the proposed rule:

> would address this problem by requiring the host employer to
> inform contract employers of any know hazards that the contractor
> or its employees might fail to recognize. This provision should
> ensure that the contractor will be able to take measures to protect
> its employees from hazards posed by the host employer's
> workplace.
>
> * * * * *
>
> Although this provision would not require the host employer to
> inform the contract employer of hazards the contract employees
> should be expected to recognize, such as hazards posed by
> overhead power line, the proposal would require the host employer

to inform the contract employer of known hazards the contractor might not be aware of.

70 Fed. Reg. at 34,839.

Under recognized standards, these words were not yet government policy. During trial OMB approved publication, and the words then expressed government policy, although it was not yet a rule. The proposal was subject to whatever change might be wrought during further rule-making processes before its publication in the Code of Federal Regulations and subject also to court challenges to the rule. If this action by OSHA is evidence, then it is clearly newly discovered.[9]

During the trial, the prosecution offered testimony that the energized wire in the static position which killed Blake Lane was a common and well-known hazard, but it did not argue the point in its closing. In the end, it prosecuted the case on the premise that Defendant did not know that the wire might be hazardous and its fault lay in not complying with OSHA rules that required them to find out that it was not a hazard before it proceeded. It did so because L.E. Myers' employees all testified that they were unaware of apparent static wires ever being energized. The 1970 work on the wire was too thin a reed on which to build a convincing argument that Defendant specifically knew of the static wire hazard in 1999.

---

[9] Defendant also relies on *Brady v. Maryland*, 373 U.S. 83 (1963), in its argument for a new trial. It concedes the prosecutor did not know of this OSHA action, but states that OSHA was part of the team prosecuting the case. It claims OSHA's failure to disclose, at least at the time the proposal became official policy, is a violation of *Brady* as defined in *United States v. Wilson*, 237 F.3d 827 (7th Cir. 2001). However, the policy did not exist at the time of trial, so there was no obligation to disclose that which was not yet evidence. The loss of the *Brady* argument has some significance since the standard for reversal under Brady is that the undisclosed evidence carries a "reasonable probability of affecting the outcome." The standard for a new trial based on newly discovered evidence is the existence of the likelihood of a different outcome.

The regulations do not make any explicit reference to the particular hazard found in this case. This was part of the defense that the regulation requiring Defendant to check for energy did not apply to wires which Defendant reasonably believed it was not required to check. Now, though, the regulations do make such a reference. Defendant notes that it could be convicted only if it knowingly failed to take precautions required by the regulations. It argues then that:

> If a contractor is not even aware that a particular type of hazard might exist, it cannot be deemed to have wilfully failed to identify and protect against that type of hazard. If OSHA itself believes that the regulations need to be clarified to fill in the gap for hazards which are unrecognized by outsiders, such as L.E. Myers, then how can L.E. Myers be held responsible for willful non-compliance with those regulations?

(Def.'s Br., at 36)

Defendant does not contend that the proposed regulation, which imposes obligations on ComEd rather than its contractors, is a complete defense to the charges. L.E. Myers concedes that it has an independent obligation to follow safe practices to protect its own workers. If it were evidence, what OSHA's proposal (its official policy) might establish is that energized "static" wires are not a hazard which outside contractors are expected to recognize.

The Government, assuming that the OSHA policy is evidence, argues that it is merely impeaching and was not even in existence at the time of trial. *See generally United States v. Curtis*, 280 F.3d 798 (7th Cir. 2002) (newly discovered evidence must be material, rather than merely impeaching, and must be evidence that would lead to an acquittal in the event of a new trial; denial of a claim of newly discovered evidence is reviewed under an abuse of discretion standard). The law generally requires that newly discovered evidence be in existence at the time of the trial. Otherwise, the socially desirable goal of finality in adjudication would be at serious risk. Yet there are cases where evidence not in existence at the time of trial is seen as a proper

basis for a new trial.  *See United States v. Pierce*, 62 F.3d 818, 825 (6th Cir. 1995) (allowing a post-trial confession made by someone other than the accused).  The line of cases allowing *newly existing* evidence to allow a new trial is limited to cases in which a new trial is seen to be mandated by the interests of justice – a very high standard which the OSHA official policy cannot meet.  Even if it did, Defendant's argument fails.

The Government spends some time effectively refuting an argument Defendant does not make – that OSHA's action changes the applicable rules at the time of Blake Lane's death.  However, the refutation does bear on the defense's claim that OSHA's policy is a statement of fact inconsistent with the prosecution's theory.  Even if this is correct, by operation of law, OSHA's policy is not final.  It might well be modified in the period allowed for public comment.  While I doubt that L.E. Myers would express the slightest objection to the factual premise of the OSHA policy,  I believe that utilities, such as ComEd, would dispute its factual accuracy, or at least seek greater specification of what hazards might be deemed as known.  The prosecution also notes that this only became policy after the trial was over, which is when it was published.  *Clay v. Johnson*, 264 F.3d 744, 749-50 (7th Cir. 2001); *see also Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 845 (1986).

There is also the difficulty of asking the finder of fact to weigh the testimony of an actual witness, saying that a hazard was well-known and common, against an agency's written rationale for a new rule implying, but not saying outright, that this particular hazard was not well-known or common.[10]  A knowledgeable witness from OSHA was not offered.

---

[10]As the trial judge did, I assume, without deciding, that a declaration by OSHA would be deemed an admission against interest by a government agency, and therefore an admission by the United States.

In the end, the prosecution's case was simple. A visible insulator connected the fatal wire to the tower, binoculars were available to see it and Defendant's supervisors did not scan the tower, despite knowing that OSHA regulations required them to assume that electric lines were energized until proven otherwise. None of this depends on the jury believing that the hazard was well-known.

Had the OSHA policy been used as evidence, the trial might have been lengthened a bit, but it would have been argued and decided the same way. The jury would have been asked to convict solely because no effort was made to discover even a rare hazard.

In her ruling, the trial judge noted that statements made in a preamble to a proposed rule are likely not binding upon private parties or the agency. *Florida Power & Light Co. v. Environmental Protection Agency*, 145 F.3d 1414 (D.C. Cir. 1998). She also noted that OSHA did not say that the energized wire in the static position was, in fact, a hazard which contractors would not or could not recognize. Rather, it said, in the typically tentative language of federal regulators, that it "might" be a risk that would not be recognized. She considered the offered evidence in light of the proceedings before her and denied the request for a new trial based on newly discovered evidence. Her finding is entitled to deference. *United States v. DePriest*, 6 F.3d 1201, 1216 (7th Cir. 1993). The trial record supports her ruling.

The judgment below is affirmed.

ENTER:

James B. Zagel
_____
James B. Zagel
United States District Judge

DATE: Jun 13, 2007